**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Stefannie Dyson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-3325 |
| v. | ) | |
| | ) | Hon. April M. Perry |
| S. Klimek, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Stefannie Dyson ("Plaintiff") contends that she was unjustly designated as an escape risk while detained at the Cook County Jail. As a result, Plaintiff alleges that she was subjected to conditions and restrictions of confinement that constituted punishment and further complains that she did not receive procedural due process protections when the restrictions were implemented. Plaintiff identified Defendants Lonnie Hollis, Michael Lucente, Roxane Boutte, and Steven Klimek (collectively, "Defendants") as the jail officials allegedly responsible for implementing and maintaining the restrictions. *See* Doc. 7 at 5-6, 8. Defendants deny causing or participating in a constitutional violation stemming from Plaintiff's security designations and have moved for summary judgment. For the following reasons, the Court grants Defendants' motion.

**LEGAL STANDARD**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers the evidence "in the light most favorable to the non-moving

party," giving the non-moving party "the benefit of reasonable inferences…but not speculative inferences." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citation omitted). The substantive law controls which facts are material. *Anderson*, 477 U.S. at 248. After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The procedures set out in L.R.56.1 "serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). Unsupported facts, "metaphysical doubt as to the material facts," and facts supported only by inadmissible evidence are insufficient to avoid summary judgment: "a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (internal quotation marks omitted).

## BACKGROUND[1]

Plaintiff was a pretrial detainee at the Cook County Department of Corrections ("CCDOC") from January 5, 2021 through February 6, 2024. Doc. 179 ¶ 1. On November 19, 2021, Defendant Klimek generated an Incident Report concerning three detainees: S. Logan, L.

---

[1] The Court recounts only properly supported facts that are relevant to the claim that was allowed to proceed in this case: "a claim under the Fourteenth Amendment stemming from the purportedly prolonged and atypical restrictions placed on Plaintiff as a result of being designated an escape risk." Doc. 164. All facts are undisputed except where noted.

Eilken, and Plaintiff. Doc. 178 ¶ 13; Doc. 178-5. As relevant to Plaintiff, Klimek reported:

"Detainee Logan related to [Klimek] that Dyson, Stefannie 20210105078 on C2 stated to her the following, 'If you want to break up outta here pretend you're sick at night, use your handcuffs to strangle the officer and escape and make sure you get the keys.'" Doc. 178-5. Klimek's report recommended no action as to Plaintiff, but "notifications" were sent to Supt. Johnson, CCOMS, CCSO PREA, SIU, Classification, Cermak, and SOC. *Id.*[2]

Following receipt of Klimek's report, investigators with the Cook County Sheriff's Office Strategic Intelligence Unit ("SIU") interviewed detainee Logan. Doc. 178 ¶ 15. An Intelligence Information Report reflects that Logan was questioned about the information she gave Klimek, and Logan reiterated that during the preceding month Plaintiff had told Logan: "At night fake like you can't breath [sic] so that they will have to take you to Cermak. While you are walking outside you can get behind the officer and because you are handcuffed you can use the handcuffs to choke out the officer and take their keys." Doc. 178-6 at 2. When asked what Plaintiff told her to do after taking the keys, Logan said that Plaintiff told her, "you could take your handcuffs off and you would be free to run around since you were already outside." *Id.* Logan told the officers that "she has overheard [Plaintiff] state this before to other inmates in the dorm but was unable to give specifics as to whom or how many others she had told." *Id.*

The SIU investigators also reviewed Plaintiff's recorded telephone calls. Doc. 178 ¶ 16. The investigators included in their report a description of a call on November 16, 2021, during which Plaintiff was talking to an unidentified male about legal issues. Doc. 178-6 at 3. The

---

[2] The abbreviations in the Incident Report are not defined.

investigators reported that, "[t]owards the end of the call [Plaintiff] begins to state that there was an issue in the dorm and she had to 'act a fool' in order to get something done about it." *Id.* Plaintiff also purportedly told "the caller that she wanted to bust out windows, break the TV, the tier radio and other acts of violence." *Id.* According to the report, Plaintiff brought up breaking windows for a second time during the call and said, "just wait, they will see. I already have it all planned out." *Id.*

Plaintiff was not issued a disciplinary ticket and was not found guilty of any infraction in connection with the SIU investigation. Doc. 178 ¶ 21. The intelligence report reflects, though, that the SIU investigators notified the SIU Director and "DOC Classification" of the results of the investigation "and proper security alerts were added to [Plaintiff's] file." Doc. 178-6 at 3.

Plaintiff denies planning an escape, attempting escape, or instructing anyone to escape. Doc. 182 at 26. She contends that inmate Logan was not a reliable source of information. *Id.* In addition, Plaintiff explains that her reference to "act[ing] a fool" during the recorded telephone call concerned "an issue in the dorm," not an escape plan. *Id.* She clarifies: "those phrases referred to protesting dangerously hot conditions and attempting to avoid heat stroke death." *Id.*

### Classifications at CCDOC

Inmates at CCDOC are assigned housing based on safety and security considerations. Doc. 178 ¶ 1. In determining housing assignments, CCDOC classification personnel consider factors such as the inmate's behavior, mental health condition, safety risks, and escape history or escape risk. *Id.* ¶¶ 2, 25. Inmates are classified as minimum, medium, or maximum security. *Id.* ¶ 12. Higher classifications involve increased restrictions. *Id.*

4

General population housing includes dormitories and celled tiers. *Id.* ¶¶ 4, 5. Lt. Joseph Hilburger, who is assigned to the Classification Unit at CCDOC, attested that "[c]ell housing is considered general population housing." *Id.* ¶ 5; Doc. 178-3 ¶¶ 1, 6. "Cell housing"—*i.e.*, housing on a celled-tier—"is not disciplinary segregation." Doc. 178-3 ¶ 7. "Cell housing is generally considered a more secure environment than dormitory housing for safety and security reasons." *Id.* ¶ 8. In addition, CCDOC policy provides that single-occupancy cells (which the Court understands to be single-person cells in a general-population, celled tier) may be used for non-disciplinary reasons that involve safety or mental-health concerns. Doc. 178 ¶ 6.

Rehabilitation Unit ("RU") housing generally is used for inmates who are awaiting or have concluded disciplinary hearings. *Id.* ¶ 7. However, RU housing is not limited to disciplinary confinement. *Id.* Placement in RU housing also may occur due to housing needs, bed availability, or other operational considerations. *Id.* Privileges may be restricted in the RU. *Id.* ¶ 9. Out-of-cell time also may be limited for safety and security reasons. *Id.* ¶ 10.

CCDOC policy mandates periodic review of an inmate's classification status and documents show that CCDOC officials periodically reviewed Plaintiff's housing status as part of the classification process. *Id.* ¶¶ 3, 39. Plaintiff's classification history reflects periodic review of her security status, which was increased from "minimum" to "medium" before the events giving rise to this lawsuit. *Id.* ¶¶ 65-70.

### Restrictions Placed on Plaintiff Following the SIU Investigation

On November 20, 2021, Defendant Lucente, the Director of Intelligence and Investigations, approved the following security alerts as to Plaintiff: "Escape Risk," "Threats Against Correctional Officers," and "Must Be Housed in Cell Setting." *Id.* ¶¶ 19-20. That same

5

day, the Classification Unit issued a "House Alone-Out Alone" alert. *Id.* ¶ 22. The House Alone-Out Alone alert required Plaintiff to be housed alone in a cell and restricted to solitary out-of-cell movement. *Id.* ¶ 23. However, instead of being placed in a single-person cell, Plaintiff was placed in the RU. According to Lt. Hilburger, Plaintiff was housed in the RU from November 20, 2021 to November 30, 2021 due to housing availability and not as a disciplinary sanction. *Id.* ¶ 26. A notation on Plaintiff's House Alone-Out Alone alert specified: "Detainee is not RU; she is single-cell placement." *Id.* ¶ 24. A second, separate alert specified: "Detainee is housed in RTU-2A due to no available single cells in 3AX. Please transfer to 3AX-A1 when a cell becomes available." *Id.* ¶ 27.

Plaintiff disputes that she was housed in the RU due to lack of available housing, but does not cite any evidence that there was alternate housing available for her. Doc. 182 at 20. She testified at her deposition that she believed she was allowed out of her cell for about one hour per day in the RU, but she could not remember specifically. Doc. 178 ¶ 30.

On November 30, 2021, Plaintiff was moved to a general-population celled tier, Division 3AX ("DIV3AX"). *Id.* ¶ 28. Shortly after her arrival in DIV3AX, Plaintiff says that she asked for the "House Alone-Out Alone" alert to be removed, and it was removed by December 6, 2021. *Id.* ¶¶ 29, 31. However, the "Escape Risk," "Must Be Housed in Cell Setting" and "Threats Against Correctional Officers" alerts were not removed; they remained active throughout Plaintiff's detention. *Id.* ¶ 33.

As relevant to this lawsuit, Plaintiff was housed in DIV3AX from November 30, 2021 to December 30, 2021; April 12, 2022 to May 8, 2022; July 29, 2022 to December 24, 2022; and January 6, 2023 to March 25, 2023. *See* Doc. 178-10. Plaintiff says that she was subject to

6

"segregation-like restrictions" when in DIV3AX. *See* Doc. 182 at 27. Restrictions included confinement to her cell for up to twenty-two hours a day and the denial of "routine privileges and movement." *Id.* Plaintiff also contends that the conditions in DIV3X were "harmful and degrading" because of "mold, water leaks, [and] unsafe surfaces[.]" *Id.* She believes placement in DIV3AX constituted "punishment" even though Defendants insist that DIV3AX was general population housing. *Id.* at 27-28.

Plaintiff's housing and bed assignments were changed many times between December 2021 and October 2023. *Id.* ¶ 34. The records reflect that even though the escape-risk and cell-setting alerts remained active, Plaintiff was not always housed on a celled tier after December 6, 2021. *Id.* ¶¶ 35-38. For example, a notation dated December 20, 2021 reflects that Defendant Lucente authorized Plaintiff's placement in a dormitory setting pending identification of "appropriate cell-setting" housing. Doc. 178-9 at 4.

CCDOC records also reflect that Plaintiff was returned to the RU on several occasions because of disciplinary matters that had nothing to do with her security alerts. Doc. 178 ¶¶ 40-43. For example, in March 2022 Plaintiff was disciplined with five days in the RU after receiving a ticket for failing to obey an officer's order to remove objects hung in her cell that were obstructing the officer's view into the cell. *See id.* ¶¶ 40, 43; Doc. 178-13 at 24-25.

Plaintiff was moved from DIV3AX to DIV08-2A-3-2 on December 24, 2022, "[b]ecause of the lack of heat and freezing conditions" in DIV3AX. Doc. 182 at 6, 27. Plaintiff states that while in DIV08-2A-3-2, she was confined to her cell for 22 to 24 hours per day, "denied

meaningful microwave access," and denied the ability to purchase items from the commissary. *Id*. Plaintiff remained in DIV08-2A-3-2 for thirteen days. *Id*.

As to her other housing assignments, Plaintiff contends that she was housed in a cell-setting most of the time, *see id*. at 29, but she admitted during her deposition that she was not continuously housed in a cell setting, Doc. 178 ¶¶ 35, 38.

### Removal From Religious Services List

Approximately eighteen months after the November 20, 2021 security alerts were implemented, Plaintiff asked to attend religious services with other inmates, but her request was denied. Doc. 182 at 29. Plaintiff submitted a grievance about the denial, noting that she had requested the escape-risk designation be removed from her record. *Id*. The response to the grievances acknowledged the escape-risk designation and instructed: "IIC shall be allotted religious service when it is available if it does not pose a security risk." *Id.* at 69. The response is dated June 19, 2023, and signed by Lt. Greer. *Id.* Director Mueller denied Plaintiff's appeal of Greer's response. *Id.*

On August 20, 2023, Plaintiff's second request to attend religious services was denied. *See id*. at 67-68. Plaintiff's grievance about the denial reflects that Sergeant Southfort told her that her name "is no longer on the list[.]" *Id.* The officer who responded to the grievance confirmed that Plaintiff's name was not on the "list" and that her name "had never been on the list." *Id.* The officer indicated that "religious services has been notified." *Id.* Director Mueller denied Plaintiff's appeal. *Id.* Plaintiff testified at her deposition that she was able to attend religious services after filing the grievances, but it took approximately two months. Doc. 178 ¶ 49.

Plaintiff initiated this lawsuit in May 2023 because, in her opinion, she had been "falsely labeled as a psychiatric P3 inmate and escape risk" and, as a result, had been subjected to adverse conditions at CCDOC. Doc. 1 at 12. The Court identified no fewer than twenty-one separate complained-of events in the original complaint and dismissed the complaint for improper joinder of claims and defendants. Doc. 6. Plaintiff subsequently initiated a separate lawsuit concerning her psychiatric designation, *see Plaintiff v. Oyewole*, No. 23-cv-6388 (N.D. Ill.), and narrowed the focus of this lawsuit to claims stemming from the restrictions placed on her because of the escape-risk designation. *See* Doc. 7.

In allowing Plaintiff's amended complaint to proceed, the Court specified that the scope of this litigation was limited to a Fourteenth Amendment claim against Defendants Hollis, Lucente, Boutte, and Klimek "stemming from the purportedly prolonged and atypical restrictions placed on Plaintiff as a result of being designated an escape risk." Doc. 164 at 1; *see also* Doc. 9. The Court dismissed claims stemming from conduct by low-level officers concerning Plaintiff's day-to-day movement, such as a denial of beauty shop access, occasional use of "blue box" restraints, and occasional denials of dayroom time. Doc. 9. The Court also denied Plaintiff's motion for leave to amend the operative complaint to include a First Amendment retaliation claim, a failure-to-protect claim, and a stand-alone conditions-of-confinement claim. Doc. 164. Thus, the only issue presented by this case is whether the restrictions imposed on Plaintiff as a result of the November 20, 2021 security alerts violated the constitution and, if so, whether Defendants Hollis, Lucente, Boutte, and Klimek caused the violations.

9

**ANALYSIS**

Defendants argue that they are entitled to summary judgment for three primary reasons: (1) restrictions placed on Plaintiff following issuance of the November 20, 2021 security alerts did not violate the Fourteenth Amendment; (2) there is no evidence that Defendants were personally involved in a constitutional deprivation; and (3) even if Defendants were involved in a constitutional deprivation, they are entitled to qualified immunity. Doc. 177. The Court considers each argument in turn.

## I. Fourteenth Amendment Due Process

The Court begins with Plaintiff's Fourteenth Amendment claim. Both parties devote a portion of their arguments to the "atypical and significant hardship" criteria established in *Sandin v. Conner*, 515 U.S. 472 (1995). In its July 26, 2023 screening order, the prior judge assigned to this case applied *Sandin* to Plaintiff's claims. Doc. 9. However, the Seventh Circuit has since stressed that *Sandin* does not apply to claims challenging a pretrial detainee's placement in segregation:

> Unlike convicted prisoners, pretrial detainees have a protected liberty interest in avoiding any nontrivial punishment. *See Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002). To be entitled to procedural protections, therefore, a detainee does not have to satisfy the more exacting standard applicable to a convicted prisoner, who has a liberty interest only when a punishment results in an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' *Hardaway v. Meyerhoft*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). . . . A measure amounts to punishment— and triggers procedural due-process safeguards—if, among other things, jail officials show an express intent to punish. *See Bell v. Wolfish*, 441 U.S. 520, 538-39, 561 (1979); *see also Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019).

*Roundtree v. Dart*, No. 23-2576, 2025 WL 401207, at *2 (7th Cir. Feb. 5, 2025). Thus, the focus should not be on whether Plaintiff had a "liberty interest" in a particular housing assignment or

10

privilege. The focus is, instead, on whether the restrictions imposed on Plaintiff constituted "punishment." If so, Plaintiff was entitled to procedural due process protections.

It is well-established that jail officials may take "administrative measures . . . to maintain security and order" at a detention facility without triggering the need for due process. *Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999) (quoting *Bell*, 441 U.S. at 540). Security measures, which may include restrictions on a detainee's movement or privileges, "may at times be discomforting, but, as long as they are reasonably related to the effective management of the confinement facility, they are not considered punishment[.]" *Id.* (internal quotations omitted). A managerial restriction "amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Id*. at 1005. "Additionally, a restriction or condition may amount to punishment if prison officials are deliberately indifferent to a substantial risk to the detainee's safety." *Id.* (internal quotations omitted). Courts defer to the judgment of jail officials on matters of security absent "substantial evidence in the record to indicate that the officials have exaggerated their response to" a security threat. *Id.* at 1003 (quoting *Bell*, 441 U.S. at 540 n.23).

Here, Plaintiff does not point to any evidence in the record that demonstrates any of the defendants had an express intent to punish her. Nor does Plaintiff provide evidence that her housing classification notes were not rationally related to a legitimate non-punitive government purpose. Although Plaintiff argues that detainee Logan's allegations against Plaintiff should not have been believed, Plaintiff does not dispute that Logan did in fact tell jail officials that Plaintiff was devising an escape plan. Doc. 182 at 4. Similarly, while Plaintiff argues that her recorded

11

phone call was misconstrued, she does not dispute that she did threaten to damage jail property. *Id*. at 19. After security threats are detected, jail officials have a legitimate interest in taking steps to secure detainees and the jail, without notice and a hearing, and without running afoul of the constitution. *See Rapier*, 172 F.3d at 1003 (explaining that implementation of security measures "is peculiarly within the province and professional expertise of corrections officials"). The question therefore becomes whether Plaintiff can demonstrate a genuine dispute of fact that her treatment was excessive, or that any defendant was deliberately indifferent to a substantial risk to her safety. For the reasons that follow, the Court does not believe that Plaintiff's security designation, "lockdown conditions," or DIV3AX housing demonstrate either excessiveness or deliberate indifference.

### A. *Security Designation*

The Court finds that a reasonable jury could not conclude that Plaintiff's designations as "Escape Risk," "Must Be Housed in Cell Setting," "Threats Against Correctional Officers," and "House Alone-Out Alone" were excessive. Undisputed facts establish that jail officials received information that Plaintiff was instructing inmates on how to assault correctional officers and, arguably, how to escape. An investigation then revealed that Plaintiff had voiced her intent to damage jail property. The designations therefore were related to the legitimate non-punitive government purpose of securing the jail. Moreover, the designations, in and of themselves, did not constitute punishment. The record demonstrates that, despite the designations, Plaintiff was housed in a dormitory-style setting for months at a time, with many of Plaintiff's housing assignments based upon operational issues unrelated to her security designations. *See, e.g.*, Doc. 178 ¶ 36 (Plaintiff housed in dormitory setting for more than three months); Doc. 178-9 at 4

12

(Plaintiff housed in dormitory because no cell was available); Doc. 182 at 6, 27 (Plaintiff moved because of heating issues); Doc. 182 at 21 ("Plaintiff admits she was housed in dormitory settings during multiple periods after the November 20, 2021 alerts."). Plaintiff's security designations simply do not constitute a Fourteenth Amendment violation.

### B. *"Near Continuous Lockdown Conditions."*

There could potentially be a Fourteenth Amendment violation if Plaintiff demonstrated that her security designations led her to be placed in housing with excessive restrictions. Plaintiff argues that this is exactly what happened, because she experienced "approximately 22-hour lockdown conditions during certain placements" and "prolonged cell-setting confinement." Doc. 182 at 32. Specifically, Plaintiff points to two periods where this occurred: (1) her placement in the RU immediately after the security alerts were issued, and (2) her move to the "hole" on December 24, 2022. *Id.* But the evidence does not support a conclusion that Plaintiff was subjected to prolonged periods of segregation or uninterrupted cell confinement because of the November 20, 2021 security alerts.

Beginning with the November 20, 2021 move to the RU, it is undisputed that Plaintiff was transferred from a general population dormitory setting to the RU following issuance of the security alerts. However, the documents submitted by Defendants establish that Plaintiff was only placed in the RU because there were no available single-person cells. Doc. 178 ¶ 26. While Plaintiff disputes this because she saw other detainees assigned elsewhere, she does not provide any evidence about their security classifications or that there was an available placement that matched her security classification. Therefore, Plaintiff's movement to RU could not be considered excessive. *See Higgs*, 286 F.3d at 438 ("Suppose for example that the only vacant cell

13

left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision.").

The same is true for Plaintiff's move from DIV3AX to DIV08-2A-3-2 on December 24, 2022. Plaintiff says she "experienced approximately 22-24 hours per day in-cell, microwave denial, commissary and food-delivery restrictions, and phone restrictions" in DIV08-2A-3-2. Doc. 182 at 32. She argues that "[a] reasonable jury could conclude [she] experienced segregation-like punishment without disciplinary process" because of the restrictions on her movement and privileges while in DIV08-2A-3-2. *Id.* However, it is undisputed that Plaintiff was moved to DIV08-2A-3-2 because of a heat malfunction in DIV3AX. Doc. 182 at 6 (Plaintiff acknowledges she was "held in the hole due solely to the lack of heat in Annex 3 A 1."). There is therefore no evidence that Plaintiff's move was punishment. Absent evidence that the need to house Plaintiff in a secure environment was exaggerated, the transfer did not trigger the need for notice or a hearing. *See Roundtree*, 2025 WL 401207, at *2 ("No process is required if a detainee is placed in segregation because of an investigation, safety and security reasons, or other non-punitive purposes."); *Halligan v. Oldham*, No. 24-1481, 2025 WL 1289343, at *2 (7th Cir. May 5, 2025) ("[N]o process is due when a detainee is placed in segregation for nonpunitive reasons such as institutional safety or security.").

In her briefs, Plaintiff also complains about numerous isolated denials of out-of-cell time unrelated to her security classification, but the Court already rejected Plaintiff's attempts to bring claims in this case against individual correctional officers who had no involvement with her security alerts. Doc. 9, 164.[3] Similarly, much of Plaintiff's briefing focuses on housing changes

---

[3] Plaintiff filed nearly 400 grievances during her time in CCDOC custody. Doc. 178 ¶ 44. Many of them Plaintiff raises again in briefing, despite no obvious relation to her security alert designation and the Court informing her that

14

due to Plaintiff's psychiatric classification, which she litigated in a separate case and is not part of this litigation. Finally, Plaintiff does not contest that she was housed in RU multiple times after having received disciplinary tickets. Doc. 182 at 21-22. None of these housing placements were due to Plaintiff's security designations. In short, Plaintiff has not demonstrated a genuine issue of material fact that would show that her security designations led to her being placed in lockdown.

### C. DIV3AX Housing

Plaintiff also contends that her intermittent placement in DIV3AX-A1 constituted "punishment." Doc. 182 at 32. To establish that DIV3AX-A1 was used by jail officials as punishment, Plaintiff points to the conditions on the tier that, she says, included mold, leaks, and the presence of "unstable, violent" inmates. *Id.* at 32-33. She then argues that "[a] reasonable jury could conclude that [DIV3AX-A1] functioned as a punitive or control unit rather than ordinary general population." *Id.* at 33.

Plaintiff's argument misses the mark. The Constitution does not guarantee inmates housing in "ordinary general population" given the broad discretion granted to jail officials over housing assignments and facility security. Thus, the fact that DIV3AX-A1 was more restrictive than a general population, dormitory setting is not enough to establish that her assignment to DIV3AX-A1 was punitive. Similarly, Plaintiff's assertion that she was exposed to mold, leaks, and allegedly "unstable, violent" inmates in DIVS3AX-A1 does not establish that the conditions were intended as punishment even though the conditions might have been less than ideal. In order to show deliberate indifference to her safety, Plaintiff must show that prison officials

---

this case is to focus only on deprivations associated with the security alert designation.

"act[ed] indifferently to a known risk that [Plaintiff] would die or suffer grievously." *See Rapier*, 172 F.3d at 1005-06. The headaches and "respiratory irritation" that Plaintiff reported having while in DIV3AX do not meet that high standard. Doc. 182 at 5, 45 (Plaintiff's grievance notes "headaches and allergy symptoms.").

### D. *Review of Plaintiff's Security Designations*

Despite the fact that Plaintiff has not demonstrated that she was punished or that any officer was deliberately indifferent to her safety, she was entitled to some due process protections with respect to her security designations. Specifically, due process requires jail administrators to periodically review whether administrative restrictions remain appropriate. *Halligan*, 2025 WL 1289343 at *2. "[T]he frequency of the reviews is left to the discretion of jail administrators[.]" *Id.* To satisfy due process, any review "must be an actual review—*i.e.*, one open to the possibility of a different outcome." *Id.* (internal quotation marks omitted).

Plaintiff acknowledges that her classification decisions were periodically reviewed but argues that the reviews were not meaningful because the "restrictive alerts" remained in place throughout her detention. Doc. 182 at 35. The record before the Court demonstrates, though, that restrictions placed on Plaintiff were adjusted on at least three occasions. First, it is undisputed that the "House Alone-Out Alone" alert expired on December 6, 2021. According to Plaintiff, the alert was removed at her request, *see* Doc. 178 ¶ 31, which suggests that the alert was meaningfully reviewed. Second, documents submitted by Defendants reflect that a Sergeant authorized Plaintiff's placement in a dormitory setting pending identification of appropriate cell-setting housing even though the escape-risk and cell-setting alerts remained active. Doc. 178-9 at 4. This also suggests that correctional officers were actively reviewing and identifying

16

appropriate placements for Plaintiff. Documents submitted by Defendants similarly show many adjustments to Plaintiff's housing assignments following issuance of the November 20, 2021 security alerts, again suggesting that jail officials were open to periodically reassessing and adjusting her housing assignments. *See* Doc. 178-10. Third, Plaintiff submitted evidence that jail officials took steps to allow her to attend religious services even though the escape-risk designation remained active.

Simply put, Plaintiff's belief that the security alerts and restrictions flowing from the alerts were not meaningfully reviewed because she did not obtain the outcome she hoped for is not enough to establish that the alerts were not, in fact, meaningfully reviewed. *See Bordelon v. Bd. of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016) ("Conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment."). Likewise, the fact that the escape-risk and cell-setting alerts remained in effect until her release from CCDOC custody is not enough to defeat summary judgment given a record of adjustments to Plaintiff's housing assignments and the restrictions flowing from the security alerts. *See Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will not suffice" to defeat summary judgment.).

## II.    Defendants' Personal Involvement

Even if Plaintiff had demonstrated a genuine dispute of fact as to whether she suffered a constitutional deprivation, Defendants would still be entitled to summary judgment because there is not sufficient evidence to demonstrate that they were responsible. "Section 1983 creates a cause of action based upon personal liability and predicated upon fault." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Thus, a defendant cannot be held liable under section 1983

17

unless evidence shows that he or she caused or participated in a constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Beginning with Defendant Boutte, Plaintiff testified that she never spoke to Boutte. Doc. 178 ¶ 59. Plaintiff further testified that she had no knowledge of Boutte approving or maintaining her security alerts. *Id.* ¶ 64. Boutte has no recollection of personally making any decisions about Plaintiff's security classification or housing. *Id.* ¶ 56. In order to establish Boutte's involvement in her security classifications, Plaintiff relies on hearsay that she asked other correctional officers to contact Boutte, and that they told her "that only Boutte, Hollis, or Klimek can approve such decisions." Doc. 182 at 6-7. But an opponent to summary judgment may not rely on hearsay and unsupported statements to establish a disputed issue of fact for trial. *See Bordelon*, 811 F.3d at 989 ("We have made clear that the evidence supporting a factual assertion must represent *admissible* evidence.") (emphasis in original). As best the Court can tell, the only non-hearsay evidence submitted about Boutte's personal involvement with Plaintiff is an exhibit demonstrating that Boutte denied Plaintiff an extension of phone time while in the RU, because the phones were pre-programmed. Doc. 182 at 71. Suffice it to say, this does not demonstrate Boutte's involvement in any constitutional deprivation.

With respect to Defendant Lucente, Plaintiff testified that she never spoke to Lucente. Doc. 178 ¶ 58. Evidence shows that Lucente was responsible for approving the security alerts designating Plaintiff as an "escape risk," "threats against correctional officers" and "must be housed in cell setting." *Id.* ¶ 19. However, there is no evidence that Lucente was involved in any of Plaintiff's complained-of cell placements. Given this, there is no evidence that Lucente caused Plaintiff to suffer a constitutional deprivation.

18

With respect to Defendant Klimek, Plaintiff testified that she never had a formal conversation with Klimek, other than interacting "in passing." Doc. 178 ¶ 60. Evidence shows that it was Klimek's report about the information he received from inmate Logan that triggered the SIU investigation. But there is no evidence that Klimek falsely reported what Logan told him, nor that Klimek was responsible for any of Plaintiff's classification or housing decisions. *Id.* ¶ 72. These facts do not suggest that Klimek caused Plaintiff to suffer a constitutional deprivation.

As to Defendant Hollis, Plaintiff points to requests she purportedly submitted to Hollis requesting removal from cell-setting-only housing. Doc. 182 at 35. Plaintiff, however, has no personal knowledge that Hollis was responsible for approving her housing assignments or security designations. *See* Doc. 178-12 at 49 (Plaintiff testified that she believed Hollis was involved given his supervisory position). Plaintiff did testify that she spoke with Hollis about the mold problems, and that Hollis disagreed with her, claiming the mold was actually dirt. *Id.* at 29-30. These facts are not enough to establish that Hollis caused Plaintiff to suffer a constitutional deprivation.

For these reasons, even if Plaintiff had demonstrated that a Fourteenth Amendment violation occurred, there is not evidence in the record to support a finding that any of these defendants are liable.

## III.    Qualified Immunity

Lastly, the Court addresses Defendants' argument that even if a constitutional deprivation had occurred for which they were personally responsible, they would be entitled to qualified

19

immunity. Qualified immunity protects public officials and employees "from liability for actions taken in the course of their official duties if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a public official or employee is entitled to qualified immunity, the court employs "a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred." *Jackson v. Anastasio*, 150 F.4th 851, 856 (7th Cir. 2025) (citations omitted). "[T]he plaintiff bears the burden of proving the law is clearly established—not the defendant." *Villalobos v. Picicco*, 168 F.4th 1057, 1062 (7th Cir. 2026). "Meeting this burden is a do or die requirement for the plaintiff's suit." *Id.* at 1063. If a plaintiff fails to identify analogous precedent clearly establishing the law, the district court "must" grant summary judgment for the defendant. *Id.* at 1062-63.

Plaintiff did not satisfy her burden. Plaintiff's opposition to qualified immunity rests on a conclusory statement that Defendants are not entitled to qualified immunity because "the outcome turns on disputed facts concerning justification, process, and personal involvement." Doc. 182 at 36. In support of her argument, Plaintiff cites *Bell v. Wolfish*, 441 U.S. 520 (1979). *Id.* But *Bell* provides only general legal principles, not the type of specificity needed to overcome a qualified immunity defense.

To defeat a defendant's qualified immunity defense, a plaintiff is required to identify "a reasonably analogous case that has both articulated the right at issue and applied it to a factual

20

circumstance similar to the one at hand." *Villalobos*, 168 F.4th at 1063. The case need not be identical, but "the bar is still high[.]" *Id.* "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).

Plaintiff has failed to identify precedent clearly establishing that the Fourteenth Amendment prohibited jail officials from restricting a detainee to single-occupancy-cell housing without notice and a hearing after an investigation revealed that the detainee posed a security threat. This is fatal to Plaintiff's case. Even if a question of fact exists as to whether the restrictions imposed on Plaintiff constituted "punishment," Defendants nevertheless are entitled to qualified immunity because it was not clearly established that notice and a hearing were required under the circumstances confronted by Defendants.

**Conclusion**

For the reasons discussed above, the Court grants Defendants' motion for summary judgment. Doc. 177. Final judgment will be entered in Defendants' favor. This case is closed.

Date: June 2, 2026                    /s/ *April M Perry*

21